**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

BONNIE CARTNER, DIMITRI CRANE, LYNN
OBERENDER, and ANN STATES, Individually
and on behalf of others similarly situated,

      Plaintiffs,

vs.

                                     Case No. 6:09-CV-1293-Orl-31DAB

HEWITT ASSOCIATES, LLC,

      Defendant.

_____/

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND**
**MOTION TO CREATE A CONDITIONAL OPT-IN CLASS**

      Defendant Hewitt Associates, LLC ("Hewitt"), by its attorneys, submits the following

memorandum of law in opposition to Plaintiffs' "Renewed" Motion to Create a Conditional

Opt-In Class and Motion to Authorize Notice to Putative Class Members ("Second Motion")

pursuant to the Fair Labor Standards Act.  Despite the fact that several individuals have opted

in to this lawsuit since Plaintiffs' first failed motion for conditional certification and despite

the apparent reduction in the scope of the proposed class of Hewitt's Customer Service

Associates ("CSAs"), the Second Motion is no more than a recycling of Plaintiffs' failed

arguments from their unsuccessful first motion.  Because those arguments have no greater

force now and do not help Plaintiffs to meet their burden of demonstrating that the members

of the putative class are "similarly situated" to them or to each other, the Court should reject

Plaintiffs' attempt to obtain certification of any class.

## I.      INTRODUCTION

Plaintiffs,[1] current and former CSAs, worked exclusively in Hewitt's benefits call center in Orlando (the "Orlando Call Center").  They allege that for a variety of different plaintiff-specific reasons, they worked "off-the-clock" in purported violation of the FLSA. In support of their Second Motion, Plaintiffs submit six affidavits from five affiants – three new and three recycled from Plaintiffs' first failed Motion.  The three "new" affidavits are virtually identical (aside from Cartner's statements about her termination) and are based almost entirely on rank speculation, inadmissible hearsay, and completely unsupported allegations.[2]  These affidavits add nothing to the record that should cause the Court to reconsider its prior denial of conditional certification.

After more than 8 months since initiating this lawsuit, Plaintiffs have virtually no evidence to justify the conditional certification of any class.  As required by the Court in its October 7, 2009 Order denying conditional certification ("Order"), Plaintiffs still have not offered any factual allegations regarding the "job requirements and pay provisions" to demonstrate similarity between them and others in the putative class; offered any "evidence that the job requirements and pay provisions of Defendant's employees in offices located

---

[1] Unless specified otherwise, "Plaintiffs" is used in this Opposition to include the four Named Plaintiffs and the nine Opt-in Plaintiffs.  A consent form was filed by an additional former employee, Antonio Banos, but the parties have filed a joint stipulation for dismissal of his claims with prejudice.  (Doc. 75).

[2] Hewitt objects to the introduction of these affidavits and the inadmissible statements contained in them. Several examples of the inappropriate "testimony" contained in these affidavits follows:  "I know this because I have had conversations with [co-Plaintiffs]" (Supp. Cartner Aff. ¶4); "I know that other CSAs were impacted by these policies and practices of Hewitt based on conversations that I had with other CSAs. . ." (Supp. Cartner Aff. ¶8; Taylor Aff. ¶8; see also DiCocco Aff. ¶8); "I have knowledge of this because CSAs often discussed [this] . . ." (Taylor Aff. ¶7); "I have personal knowledge that other CSAs whom I worked with daily were, and presumably still are, similarly situated . . ." (Taylor Aff. ¶12; DiCocco Aff. ¶12).  Rather than burdening the Court with a separate motion to strike, Hewitt simply requests that the Court disregard these and the many other similar inadmissible statements in Plaintiffs affidavits.

outside of Orlando were similar to those in the Orlando office"; or addressed "the extent to which individualized inquiries into each employee's day-to-day activities may be necessary in this case." (Order at 4-5). As this Court noted in its Order, while the standard of proof that Plaintiffs must meet for conditional certification may be relatively modest, "it is not 'invisible' and cannot be based on the conclusory allegations of a few employees." (Order at 3-4).[3] Plaintiffs have failed, yet again, to meet that burden, and their Second Motion should be denied.

## II.    FACTUAL BACKGROUND[4]

The number of factually relevant differences among Hewitt's CSAs make individualized inquiries necessary in assessing Plaintiffs' off-the-clock claims. Each of Hewitt's call centers are managed separately and employ their own CSAs to address the demands of their respective clients. Even within the Orlando Call Center, CSAs have different job duties, different schedules, different activities at the start and end of the day, different client demands, different length phone calls, different call volumes, and different personal preferences for how they handle their work load and prepare for and end the day.

### A.    Hewitt's Benefits Call Centers Are Separate And Distinct.

Hewitt employs CSAs in its four benefits call centers in the United States. (Coury Decl. ¶ 4).[5] The CSAs in each of these call centers serve different clients with different

---

[3] Citing Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996); Brooks v. Rainaldi Plumbing, Inc., Case No. 06-CV-631, 2006 WL 3544737, at *2 (M.D. Fla. Dec. 8, 2006); Simpkins v. Pulte Home Corp., Case No. 08-CV-130, 2008 WL 3927275, at *2 (M.D. Fla. Aug. 21, 2008).

[4] Hewitt submits the declarations that it filed with its opposition to Plaintiffs' first motion as well as nine new and supplemental declarations. They are as follows: Jackie Coury (Ex. 1), Colleen Davis (Exs. 2 and 3), Patricia Meessmann (Ex. 4), Cheryl Buchanan (Exs. 5 and 6), Whitney Dickens (Ex. 7), Michelle Gimenez (Ex. 8), Kelly Hinckley (Ex. 9), Ronald Housewright (Ex. 10), Dale Laird (Ex. 11), Donna Maurer (Ex. 12), Kathleen V. Mogan (Ex. 13), and Fiona Mulligan (Ex. 14).

needs and report to different managers who have substantial discretion in managing the CSAs' attendance, hours, and job performance.  (Id. ¶¶ 5-7; Davis Decl. ¶ 7).

Plaintiffs have worked only at the Orlando Call Center. (Meessmann Decl. ¶ 10).  In the Orlando Call Center, each CSA is assigned to a particular client team and is supervised by only one Team Manager ("TM").  (Davis Decl. ¶¶ 13, 15).  The Orlando TMs have discretion in how they manage attendance, timekeeping practices, and performance of the CSAs whom they supervise and how they apply the call center's guidelines and practices; for example, some are strict about issues such as tardiness while other are more lenient. (Buchanan Decl. ¶ 7; Hinckley Decl. ¶ 5; Mulligan Decl. ¶¶ 6-7).

### B.        The Orlando CSAs Have Different Job Duties.

The job duties of CSAs in Hewitt's Orlando Call Center differ substantially based on a number of factors, such as experience, subject matter expertise, and client needs and demands.  For example, Hewitt's recruiting materials have advertised CSA job openings as requiring up to 90% of the day on the phone because those materials are aimed at new hires who do not have experience handling the other types of work that CSAs perform.  (Davis Supp. Decl. ¶ 2).  As CSAs gain experience, however, some serve as on-floor supervisors, retirement specialists, survivor processors or other subject matter experts; others train, coach, and manage other Hewitt workers who handle annual benefits enrollment issues.[6]  (Id. ¶ 3). While there is no direct correlation between seniority level and phone time, CSAs who

---

[5] These call centers, in addition to the Orlando Call Center, are located in Lincolnshire, IL; Woodlands, TX; and Charlotte, NC.

[6] On-floor supervisors handle escalated customer calls; CSAs who serve as retirement specialists make lengthy outbound calls by appointment to customers who are retiring; and CSAs who serve as survivor processors help the family members of decedents with life insurance benefits.  (Davis Decl. ¶ 22).

assume these special roles or who have more client-specific projects spend much less time handling customer phone calls; some answer no customer calls at all.  (Davis Decl. ¶¶ 21-22; Davis Supp. Decl. ¶ 3; Mulligan Decl. ¶¶ 11-12; Mogan Decl. ¶ 7).

CSAs' job duties and client demands affect not only the percentage of the work day spent on the phone but also the length of each phone call.  For instance, retirement specialists and CSAs who answer the more complex client plan questions often have phone calls ranging from 15 to 45 minutes or even longer.  (Mogan Decl. ¶ 8; Davis Supp. Decl. ¶ 6; Dickens Decl. ¶ 13; Gimenez Decl. ¶ 7; Laird Decl. ¶ 12).  CSAs on Client Team 9 are new and still learning how to work efficiently in answering customer questions; they are also required by the client to read a script at the beginning of customer phone calls on certain days of the month.  (Mogan Decl. ¶¶ 9-10).  As a result of their inexperience and the special client requirements, CSAs on Client Team 9 have phone calls that last 8 to 15 minutes on average. (Id. ¶¶ 9-10).

## C.    The Orlando CSAs Have Different Work Schedules And Start And End Their Days Differently.

The work schedules of Orlando Call Center CSAs also vary widely, and those variations directly impact potential off-the-clock allegations.  Some CSAs, for example, are scheduled to start their work day with thirty minutes of off-phone work, such as client projects or meetings.  (Hinckley Decl. ¶ 12; Maurer Decl. ¶ 5; Dickens Decl. ¶ 5; Laird Decl. ¶ 2).  Most CSAs who start the work day with off-phone work do not boot up and log into their computers until 5 to 30 minutes *after* shift start time.  (Maurer Decl. ¶ 5; Laird Decl. ¶ 5).  Other CSAs are scheduled to start their work day by handling customer phone calls but are not required to boot up and log in to the computer pre-shift.  (Buchanan Supp. Decl. ¶¶ 4-

5; Hinckley Decl. ¶ 11; Maurer Decl. ¶¶ 4-5; Dickens Decl. ¶¶ 6-7).  Some log in to the

phone system first, which takes only seconds, before engaging in personal activities like

getting coffee or chatting with co-workers in the break room.  (Dickens Decl. ¶ 6; Gimenez

Decl. ¶ 4).  Some CSAs boot up their computers while taking their first call.  (Buchanan

Supp. Decl. ¶ 5; Maurer Decl. ¶ 4; Dickens Decl. ¶¶ 6-7).  Some CSAs are scheduled to

spend almost their entire shift handling or being available to handle customer calls.  (Davis

Supp. Decl. ¶ 2; Mulligan Decl. ¶ 11).  Still other CSAs are scheduled to spend several hours

of their shift handling client projects and other off-phone work.  (Davis Decl. ¶ 21; Mogan

Decl. ¶ 5; Mulligan Decl. ¶ 11).  The off-phone work may be scheduled at the beginning,

middle or end of the day.  (Dickens Decl. ¶ 11; Buchanan Supp. Decl. ¶ 3).  When CSAs end

the day with project time, they are often able to leave work as soon as their shift ends

because they are not handling customer phone calls that may run past shift end time.

(Dickens Decl. ¶ 11).

        The particular shift that a CSA works also impacts his or her ability to leave work on

time.  On those client teams that must provide phone coverage for a total of 11 or 12 hours

per day, CSAs' shifts are staggered.  (Buchanan Supp. Decl. ¶ 6; Davis Supp. Decl. ¶ 12).

CSAs whose shifts end in the middle of the day are more likely to be able to leave at their

scheduled shift end time because they typically end their day by completing the call that they

are handling near shift end time and do not need to ensure that the call queue is cleared

before leaving.  (Buchanan Supp. Decl. ¶ 9).  CSAs whose shifts end at the conclusion of the

client team's operational hours, on the other hand, will need to stay until all calls in the queue

are completed and, thus, are more likely to stay past shift end time.  (Id.).

**D.**    **The Orlando CSAs Have Different Client Demands.**

The number of phone calls that a client team receives varies among CSAs and client teams.  (Davis Supp. Decl. ¶ 8; Mogan Decl. ¶ 7; Gimenez Decl. ¶ 8; Laird Decl. ¶ 11).  The percentage of time actually on the phone is referred to as the CSA's "occupancy rate." (Davis Supp. Decl. ¶ 8).  One CSA who is scheduled to spend 7.5 hours on the phone may have an occupancy rate of 85% while another CSA on a different team who is scheduled to spend 7.5 hours on the phone has an occupancy rate of 50% for the same work day.  (Id.).  The CSA with the 85% occupancy rate may have to stay past shift end time to complete his or her off-phone duties. (Id.).  If the CSA with the 50% occupancy rate uses the down time efficiently, he or she will not need to stay past shift end time to complete any off-phone duties. (Davis Supp. Decl. ¶ 8).  Two CSAs on the same team may not have the same occupancy rate either. For instance, some client teams have retirement specialists to whom the retirement-specific client calls are routed.  Typically, a retirement specialist CSA takes fewer calls and spends less time on the phone than the non-specialized CSAs on the same client team. (Mogan Decl. ¶ 7).  The effect of client demands and occupancy rates on CSAs' hours is evident from the variations in the amount of overtime incurred by client teams. (Buchanan Supp. Decl. ¶ 8; Mogan Decl. ¶ 11; Dickens Decl. ¶ 10).

**E.**    **The Orlando Call Center's Practices Comply with the FLSA.**

As evidenced by the testimony of several Hewitt Orlando Call Center managers, Hewitt's practices comply with the FLSA.  Off-the-clock work is prohibited, and CSAs are required to accurately record work time.  (Davis Decl. ¶¶ 25-26; Buchanan Supp. Decl. ¶ 10; Laird Decl. ¶ 18; Gimenez Decl. ¶¶ 3, 6, 9; Mogan Dec. ¶ 12).  Despite Plaintiffs' attempts to

argue otherwise, there is no Orlando Call Center policy requiring CSAs to boot up and log in to their computers prior to shift start time.  (Laird Decl. ¶ 5; Buchanan Supp. Decl. ¶ 5; Maurer Decl. ¶ 4; Dickens Decl. ¶¶ 6-7).  If they do boot up and log in prior to shift start time, they include that time as time worked for the day consistent with the Orlando Call Center's practice.  (Laird Decl. ¶ 17).

CSAs' compensable hours are determined by the time cards they submit, not by their scheduled hours or the time they spend logged into the phone system.  (Davis Supp. Decl. ¶¶ 11, 18; Mogan Decl. ¶ 13).  Hewitt instructs CSAs to record their time to the closest 15 minutes.  (Davis Supp. Decl. ¶ 18).  This acceptable "rounding" practice results in Hewitt paying its CSAs for an additional full quarter hour when they perform work of more than seven minutes and not paying for work of seven minutes or less.[7]  (Id.).  When CSAs start work prior to shift start time or continue to work after shift end time, they are instructed to include that extra work time on their time cards consistent with this "rounding" practice.  (Gimenez Decl. ¶ 9; Dickens Decl. ¶ 8; Laird Decl. ¶¶ 16, 18).

CSAs are not required to, and frequently do not, keep their phone calls under seven minutes.  (Davis Supp. Decl. ¶ 7).  CSAs' phone calls range from less than one minute to 45 minutes or more on some teams, from 6 to 10 minutes on another team, and from less than six minutes to 15 minutes on yet another team.  (Davis Supp. Decl. ¶ 7; Mogan Decl. ¶¶ 8-9; Dickens Decl. ¶ 15; Laird Decl. ¶ 12; Gimenez Decl. ¶ 7).

According to Hewitt's Orlando Call Center managers who track CSA-recorded overtime, CSAs frequently record—and, consistent with the Orlando Call Center's pay

---

[7] Recording employees' time to the closest quarter of an hour is expressly permitted by the U.S. Department of Labor regulations.  See 29 C.F.R. § 785.48(b).

practices, are paid for—more than 8 hours of work per day because of customer calls that run past shift end time.  (Mogan Decl. ¶ 11; Davis Supp. Decl. ¶ 20).

CSAs also receive their full lunch break or record the lunch break as hours worked. If a phone call lasts past the beginning of a CSA's scheduled lunch break, the CSA may choose to record the time as hours worked or come back from lunch late.  (Davis Supp. Decl. ¶ 16).  In the alternative, some CSAs choose to request a full 15-minute schedule adjustment even for calls running just 2 to 4 minutes into their lunch break; in such cases, the CSAs receive an unusually long lunch break.  (Laird Decl. ¶ 13).

## III.    ARGUMENT

### A.    Legal Standard.

Plaintiffs still fail to appreciate that their relatively low burden is not the same as a free pass.  See Order at 3-4.  To obtain conditional certification of a collective action, Plaintiffs have the burden of demonstrating, at a minimum, specific factual allegations sufficient to establish that the putative class members are similarly situated to Plaintiffs and desire to participate in the lawsuit.  Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1217 (11th Cir. 2001); see also Haynes v. Singer Co., 696 F.2d 884, 887 (11th Cir. 1983) (unsupported assertions are insufficient); Brooks v. BellSouth Telecommunications, Inc., No. 1:07-CV-3054-ODE, 2009 U.S. Dist. LEXIS 20552, at *16 (N.D. Ga. Feb. 10, 2009).

Even when Plaintiffs have met this burden, the decision to authorize notice of an FLSA action to putative class members remains soundly within the discretion of the Court. See Order at 3 (citing Hipp, 252 F.3d at 1217)).  In some cases, such as in this case where Plaintiffs' claims involve many individualized inquiries into each employee's daily activities,

conditional certification of a collective action is not appropriate.  <u>Williams v. Accredited</u>

<u>Home Lenders, Inc.</u>, No. 1:05-cv-1681-TWT, 2006 WL 2085312, at *4 (N.D. Ga. July 25,

2006) (denying certification because "there must be a fact-specific, individualized inquiry" to

determine whether "off-the-clock" violations exist).

> **B.** **Plaintiffs Fail To Establish That They Are "Similarly Situated" To the Putative Class Members In the Orlando Call Center.**

To show that they are similarly situated to the putative class members in the Orlando

Call Center, Plaintiffs must make factual allegations as to the putative class members' job

duties, work schedules, and pay that demonstrate that the putative class members are similar

to them in these respects.  <u>See</u> <u>Rodgers v. CVS Pharm., Inc.</u>, No. 8:05-cv770T-27MSS, 2006

WL 752831, at *5 (M.D. Fla. Mar. 23, 2006).  In denying Plaintiffs' first motion for

conditional certification, this Court found that Plaintiffs had failed to do so and noted that

any subsequent motion would need to provide "some evidence, other than the conclusory

statements in their affidavits, that they are similarly situated to the employees whom they

seek to represent."  Order at 4.  Plaintiffs again have utterly failed to meet this requirement.

> **1.** **Plaintiffs Fail To Show That They And Putative Class Members In the Orlando Call Center Have Similar Duties.**

In support of their Second Motion, Plaintiffs resubmit the same three affidavits (from

Named Plaintiffs Oberender, Cartner, and Crane) that they filed with their first motion for

conditional certification, which they "supplement" with two affidavits from among the nine

Opt-in Plaintiffs and the "Supplemental Affidavit of Bonnie Cartner."  Like the original

affidavits, the supplemental affidavits do not describe the job requirements or pay provisions

of the "approximately 1,500 individuals" (Pls. Second Mot. at 6), working on 31 different

client teams in the Orlando Call Center (Davis Decl. ¶ 10), whom Plaintiffs seek to include in their putative collective class.  The affiants do not even bother to describe the job duties of the non-testifying Opt-in Plaintiffs, but rather merely describe their own job duties vaguely. The speculation they offer about the job duties of other CSAs based on Plaintiffs' unfounded interpretation of two job descriptions and a recruiting video from Hewitt's website does nothing to cure the fatal deficiency in their Second Motion.[8]  See Robinson v. Dolgencorp, Inc., No. 5:06-cv-122-OC-10GRJ, 2006 WL 3360944, at *5 (M.D. Fla. Nov. 13, 2006) ("a showing of similarity requires more than generalized allegations"); Holt v. Rite Aid Corp., 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004) (rejecting evidence concerning plaintiffs' job duties was "merely anecdotal" and specific to them).

> **2.     Plaintiffs Fail To Show That They And Putative Class Members In the Orlando Call Center Are Similarly Paid.**

In terms of purported pay similarities, Plaintiffs conclude, without any evidentiary support for the proposition, that all CSAs in the Orlando Call Center must perform the same pre-shift and post-shift activities.  Plaintiffs' own admissions, however, undermine their erroneous claims.  For example, Plaintiffs claim that they are not paid for computer log-in time or for times when they are not available to handle customer calls.  Yet, Plaintiff Cartner has admitted that when she started work for a different team in June 2009, she recorded and received pay for log-in time and off-phone project work. (Doc. 26, Ans. Interrog. 10 ("upon

---

[8] Plaintiffs argue, without evidentiary support from any source, that a "Day in the Life" video previously on Hewitt's website proves that all CSAs have the same duties because the CSAs in the video clip say that they spend 90% of the day on the phone.  This enormous leap is neither supported by any evidence in the record nor accurate.  It is nothing more than rank conjecture.  Hewitt's recruiting materials have advertised the CSA job as requiring 90% of the day on the phone because those materials are logically aimed at new hires who are likely to have such duties until they gain the experience required to take on additional tasks, such as special client projects or special subject matter expertise roles. (Davis Supp. Decl. ¶¶ 2-3). In fact, a substantial number of Orlando Call Center CSAs spend significantly less than 90% of their work day on the phone.  (Id.)

return to work in June 09 I was placed on one of only a few teams that allow log in and project time").  Similarly, Plaintiffs claim that they are not paid for pre-shift and post-shift work; yet, Plaintiff States has testified that she was not allowed to start work before her shift and "was told [she] could not work without getting paid for it."  (Doc. 29, Ans. Interrog. 10).

Not only are Cartner's and States's own affidavits inconsistent with their claims of uniform pay issues, but, as discussed above, CSAs are dissimilar in many ways that are critical to Plaintiffs' claims.  Some CSAs do not start or end their work day on the phones.  (Dickens Decl. ¶¶ 5, 10; Laird Decl. ¶ 2; Maurer Decl. ¶ 2).  CSAs are not paid based on their phone time or their schedule adherence but are instead paid based on the hours they record on their time cards.  (Davis Supp. Decl. ¶¶ 11, 18; Mogan Decl. ¶ 13).  CSAs are not required to boot up and log into their computers pre-shift.  (Buchanan Supp. Decl. ¶ 5; Dickens Decl. ¶ 7; Laird Decl. ¶ 5; Maurer Decl. ¶ 4).  CSAs are not required to, and often do not, keep phone calls under 6.5 minutes.  (Davis Supp. Decl. ¶ 7).  When the phone call and any post-call work time exceeds seven minutes, CSAs typically record and receive pay for an additional 15 minutes pursuant to Hewitt's "rounding" practice.  (Id. ¶ 18; Laird Decl. ¶ 16).   At the end of the day, some CSAs record and receive compensation for time spent shutting down their computers.  (Laird Decl. ¶ 16).  Others leave their desks by shift end time or within a minute or two thereafter, (id. ¶¶ 14-15), and, thus, are shutting down their computers at or prior to shift end time.

### C.     Plaintiffs Provide No Evidence About CSAs' Job Requirements and Pay Provisions in Hewitt's Other Benefits Call Centers.

As this Court has already noted, certification of a class involving other call centers is not appropriate when Plaintiffs present no actual evidence of the job duties or pay of any

CSAs in other call centers.  See Order at 4-5.  None of the Plaintiffs have worked for Hewitt

in any of its benefits call centers other than Orlando, and they offer no admissible evidence

about CSA job requirements or pay provisions in any other call centers.

Where plaintiffs have sought to include in a putative class employees from a location

where no plaintiff has worked and have provided no evidence as to a common scheme or

policy in violation of the FLSA, courts have found certification inappropriate.  Thompson  v.

Speedway SuperAmerica LLC, No. 08-cv-1107(PJS/RLE), 2009 WL 130069, at *12 (D.

Minn. Jan. 20, 2009) (denying certification because plaintiffs worked in different locations

with different managers); England v. New Century Financial Corp., 370 F. Supp. 2d 504, 511

(M.D. La. 2005) (denying certification of a case that would involve "a multitude of different

managers at different geographical locations across the country"); Horne v. United Servs.

Auto. Ass'n, 279 F. Supp. 2d 1231, 1235 (M.D. Ala. 2003) (plaintiff cannot extend the class

beyond his own work location unless he has provided evidence that employees in other

locations were similarly affected by the alleged work policies).

Contrary to Plaintiffs' conjecture, conclusory allegations, and inadmissible hearsay,

Hewitt has presented evidence demonstrating that CSAs in different call centers (like CSA in

the Orlando Call Center) are not similarly situated.  Each call center has its own managers

who supervise its CSAs.  (Coury Decl. ¶ 6).  Each call center has its own clients with

different needs that impact CSA job requirements and schedules.  (Coury Decl. ¶ 6).

Because Plaintiffs and the putative class members work in different locations under different

managers who exercise supervisory authority over their CSA's duties and compensable work

hours, they are too dissimilar to warrant certification of a collective action.  See Reeves v.

Alliant Techsystems, Inc., 77 F. Supp. 2d 242, 249 (D. R.I. 1999) (named plaintiffs not

similarly situated to opt-in plaintiffs where they had different managers and worked on

different client contracts); Brooks v. BellSouth Telecomm., Inc., 164 F.R.D. 561, 569 (N.D.

Ala. 1995) (denying certification, in part, because employees were employed in different

departments and reported to different supervisors).  Plaintiffs have, therefore, failed to satisfy

the Court's second requirement in its Order denying conditional certification that they show

how "the job requirements and pay provisions of Defendant's employees in offices located

outside of Orlando [a]re similar to those in the Orlando office."  Order at 4-5.

> **D.      Plaintiffs Fail To Demonstrate That Putative Class Members Are Interested in Participating in This Lawsuit**

To obtain conditional certification, Plaintiffs must also show sufficient interest among

putative class members in joining the lawsuit.  Here, Plaintiffs have not come close to

meeting that requirement.   This Court has recognized that this requirement must be met

*before* putting a defendant to the time and expense that results from conditional certification.

See Mackenzie v. Kindred Hosps. E., LLC, 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003)

(citing Dybach v. State of Fla. Dep't of Corr., 942 F.2d 1562, 1567-68 (11th Cir. 1991)).

Out of the "approximately 1,500 individuals," who Plaintiffs claim work in the

Orlando Call Center (Pls. Second Mot. at 6), Plaintiffs have managed to convince during the

eight months that this lawsuit has been pending only six current CSAs (Housewright,

Newman, Norris, Pytel, Staten, and Fevrier) and three former CSAs (DiCocco, Taylor, and

Sepulveda) to join their lawsuit.  (Meessmann Decl. ¶ 11).  The last Opt-in Plaintiff to file a

consent form (time-barred Plaintiff Antonio Banos) joined the lawsuit on December 3,

2009—more than three months ago.  Moreover, since joining the lawsuit, six of the Opt-in

Plaintiffs have apparently decided not to participate any further in the prosecution of their claims, as evidenced by their failure to answer the Court's Interrogatories.[9]  With only three Opt-in Plaintiffs answering the Court's Interrogatories and only two of those three submitting affidavits in support of Plaintiffs' Second Motion, Plaintiffs have fallen short of showing sufficient interest in this lawsuit to warrant conditional certification.  See Robinson, 2006 WL 3360944, at *5 (four conclusory affidavits insufficient); White v. KCPAR, No. 6:05-cv-1317-Orl-22DAB, 2006 WL 1722348, at *3-4 (M.D. Fla. June 20, 2006) (three affidavits insufficient); Rodgers, 2006 WL 752831, at *4-5.

Plaintiffs attempt to counter this obvious lack of interest among putative class members by making unsupported assertions that Hewitt has chilled interest in this case by threats of retaliation.  To the contrary, the evidence strongly supports Hewitt's fair treatment of participating employees.  First, Ron Housewright has testified in his affidavit that he did *not* tell his daughter, Plaintiff Courtney Housewright, that her job would be in jeopardy if she participated in the lawsuit.  (Housewright Decl. ¶ 6).  Second, none of the Plaintiffs who are current employees have complained that they have experienced any retaliation related to their jobs as a result of this lawsuit.  (Meessmann Decl. ¶ 11).  Of the nine Plaintiffs who were Hewitt employees when this lawsuit was filed, only Cartner's employment has been terminated.  (Id. ¶ 10).  Tellingly, her employment was terminated almost *six months* after this lawsuit was filed, during which time she made no claim that she was the object of any retaliation as a result of this lawsuit.  The other eight Plaintiffs remain employed by Hewitt

---

[9] The six Opt-in Plaintiffs who have failed to answer the Court's Interrogatories are Pytel, Newman, Housewright, Staten, Fevrier and Sepulveda.  In addition, no Plaintiff has produced a single document in his or her "possession, custody or control that pertain[s] to the unpaid wages in the Complaint" as required by this Court's Scheduling Order.  (Sched. Order, Doc. 5, ¶ 1).

(including Courtney Housewright).  (Id.).  Third, as the affidavit of Patricia Meessmann, Hewitt's Global Ethics Manager, makes clear, Cartner was fired only after an investigation confirmed that she had repeatedly transmitted confidential information about Defendant's clients' employees outside the Company, conduct constituting extremely serious violations of Hewitt's Code of Conduct, Orlando Call Center confidentiality policies, and her Confidentiality Agreement with Hewitt.  (Id. ¶¶ 4, 6, 8).  Cartner has not denied this misconduct in her supplemental affidavit that addresses her retaliation claim.  Plaintiffs' false accusations of retaliation and speculation that putative class members fear retaliation do not explain away the lack of interest in Plaintiffs' lawsuit, especially given Plaintiffs' efforts to solicit participants.[10]

Finally, even if Plaintiffs had been able to demonstrate a stronger showing of interest through additional Opt-in Plaintiffs, that would still not be enough to justify conditional certification; there must be interest in the lawsuit *by similarly situated individuals*.  See Dybach, 942 F.2d at 1567-68; Robinson, 2006 WL 3360944, at *3 ("for the Court to facilitate notice in a § 216(b) case the plaintiff must demonstrate: (1) the existence of other employees who desire to 'opt-in,' and (2) that those employees are 'similarly situated'").  Plaintiffs have not presented evidence about the job requirements and pay provisions of any of the Opt-in Plaintiffs or putative class members and have, therefore, not given the Court any basis for concluding that Plaintiffs are similarly situated to them.  Pfohl v. Farmers Ins. Group, No. CV03-3080 DT (RCX), 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004)

---

[10] Several CSAs have actually complained to Hewitt about being solicited by Plaintiffs Cartner and Oberender to join the lawsuit.  (Meessmann Decl. ¶ 12).

(burden of showing interest not met where plaintiffs provided no information regarding the opt-in plaintiffs or how they were similarly situated to plaintiffs).

### E.      **Plaintiffs' Claims Are Not Appropriate for Collective Treatment.**

Even if Plaintiffs had submitted evidence showing that they are similarly situated to each other and to the putative class members—and Hewitt contends that its evidentiary submissions establish that such a showing is not possible—there are simply too many differences among CSAs to justify conditional certification.[11]  Variations in how CSAs start their work day, how they end their work day, how often phone calls may run past shift end time and how long phone calls last, what activities CSAs include as work time, what activities (if any) they perform pre- or post-shift, and how they account for work performed during meal breaks will make many "individualized inquiries into each employee's day-to-day activities" necessary.  As this Court expressed in denying Plaintiffs' first motion for conditional certification, when individualized inquiries are necessary, conditional certification of a collective action is inappropriate.[12]  See Order at 5; see also Williams, 2006

---

[11]  While Courts generally do not make decisions on the merits at the conditional certification stage, "class certification issues cannot be decided in a vacuum" and "'[i]t is entirely appropriate for the Court to be cognizant of the factual and legal issues presented by the case when determining whether the case can be appropriately treated as a collective action.'"  West v. Verizon Comms., Inc., No. 8:08-CV-1325-T-33MAP, 2009 WL 2957963, at *4 (M.D. Fla. Sept. 10, 2009); West v. Border Foods, Inc., No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) (the court must not "overlook facts which generally suggest that a collective action is improper").

[12]  Because such individualized inquiries are common in off-the-clock cases such as this one, courts are often reluctant to grant conditional certification of FLSA claims of this type.  See Castle v. Wells Fargo Financial, Inc., No. C 06-4347 SI, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) (denying certification because "individual issues predominate such that the employees are not similarly situated"); Diaz v. Elecs. Boutique of Am., Inc., No. 04-cv-0840E(SR), 2005 WL 2654270, at *2-5 (W.D.N.Y. Oct. 17, 2005) (denying certification because plaintiff's "off the clock" allegations were too individualized); Dudley v. Texas Waste Sys., Inc., No. Civ.A.SA-05-CA-0078, 2005 WL 1140605, at *2 (W.D. Tex. May 16, 2005) (denying certification on the plaintiffs' claims for missed meal breaks because of plaintiff-specific questions that would need answered); Basco v. Wal-Mart Stores, Inc., No. Civ. A. 00-3184, 2004 WL 1497709, at *2-8 (E.D. La. July 2, 2004) (denying certification because company policy and the "off the clock" effects were not sufficiently uniform);

WL 2085312, at *4 (N.D. Ga. July 25, 2006) (denying certification because "there must be a fact-specific, individualized inquiry into each Plaintiff's day-to-day activities" to determine whether "off-the-clock" violations existed).

Rather than even attempting to address these insurmountable obstacles, Plaintiffs argue that this lawsuit is appropriate for conditional certification because a few courts in other jurisdictions have conditionally certified classes of call center employees.  In each of the cases cited by Plaintiffs, unlike this lawsuit, the plaintiffs submitted a substantial amount of evidence establishing the existence of uniform policies or practices in violation of the FLSA.  See Gipson v. Sw. Bell Tel. Co., No. 08-CV-2017 EFM/DJW, 2009 WL 1044941 (D. Kan. Apr. 20, 2009) (finding certification appropriate because defendant provided all employees with pre-populated timesheets and did not permit employees to alter their timesheets to account for pre-shift and post-shift work or non-phone activities); Burch v. Qwest Comms. Int'l, Inc., 500 F. Supp. 2d 1181 (D. Minn. 2007) (finding that all class members performed identical pre-shift tasks, such as booting up their computers).

In contrast to those cases, Plaintiffs in this case are not subject to company-wide or even call center-wide policies or practices resulting in regularly scheduled, uniform off-the-clock work by all or even most CSAs.  Indeed, the Named Plaintiffs and the three Opt-in Plaintiffs who have answered the Court's Interrogatories do not agree on the amount of pre- and post-shift activities they purportedly performed off the clock or the reasons for that off-the-clock work.[13]

---

Lawrence v. City of Philadelphia, No. 03-CV-4009, 2004 WL 945139, at *2 (E.D. Pa. Apr. 29, 2004) ("individual claims potentially vary too widely to conclude that … the [p]laintiffs are similarly situated").
[13] Only Named Plaintiff Crane claims that he should receive compensation for time spent trying to find a parking space.  (Crane Aff. ¶ 5).  Only Opt-in Plaintiffs DiCocco and Taylor claim to have at times eaten at

In cases that are truly analogous, conditional certification of a collective action has been denied.  In a recent decision from a district court within the Eleventh Circuit, Brooks v. BellSouth, 2009 U.S. Dist. LEXIS 20552, 26 employees in nine different call centers submitted nearly identical declarations claiming that they had not been paid for log in time, meal breaks, or post-shift work.  The court found the plaintiffs' claims inappropriate for collective treatment because they had not submitted "credible evidence of 'class-wide' violations of the FLSA, or ma[d]e some rudimentary showing of the commonality between their claims and those of the putative class."  Id. at *23-24.[14]  See also Adair v. Wisconsin Bell, Inc., No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008).[15]

Like the plaintiffs in Brooks and Adair, Plaintiffs have not submitted evidence of a Hewitt policy or practice that could allow for a finding that Plaintiffs and the putative class members are similarly situated.  Instead, Plaintiffs have alleged violations for certain CSAs

_____

their desks in order to perform work during some of their lunch breaks.  (DiCocco Aff. ¶ 9; Taylor Aff. ¶ 9). While some Plaintiffs admit to receiving pay for more than seven minutes of post-shift work, Opt-in Plaintiff Norris claims he was not permitted to bill for any post-shift work. (Doc. 57, Interrog. Resp. 12).  No Plaintiff provides a detailed breakdown of the purported pre-shift and post-shift activities or the amount of time spent on each activity, but they must be seeking compensation for different activities or claiming that the activities took them different amounts of time because some Plaintiffs claim 1 - 2 hours per week off-the-clock, others claim 1.5 - 2 hours, still others claim 2 - 3 hours, and some claim 2 - 4 hours.  (Compare Norris Interrog. Resp. 7(e) with Cartner Aff. ¶ 5, Cartner Interrog. Resp. 7(e), DiCocco Interrog. Resp. 7(c)).

[14] The Court found no evidence of commonality for several reasons that are apposite here.  First, the plaintiffs' declarants provided no evidence of an actual requirement that they be logged into the computers pre-shift.  Id. at *27.  The defendant submitted evidence that such a requirement did not exist.  Id. at *28.  Second, the plaintiffs made only vague claims of performing uncompensated work during meal breaks, but it appeared that schedule adjustments were available to ensure that the plaintiffs still received a full meal break.  Id. at *31-32.  Third, the plaintiffs claimed that all putative class members take incoming calls from customers, but the defendant submitted evidence that not all putative class members answer phone calls.  Id. at *32-33.

[15] In Adair v. Wisconsin Bell, Inc., No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008), call center employees claimed that they had to arrive early to log into and stay late to log off the system because they were expected to take phone calls throughout their shift.  Id. at *6.  As here, the plaintiffs did not provide the Court with any facts to support this claim.  Id.  The plaintiffs also alleged that the company's policy of rounding time to the nearest 15 minutes justified conditional certification, but the court found that the FLSA regulations expressly authorize a 15-minute rounding policy.  Id. at *11.

in the Orlando Call Center that even were such allegations true, would not support class treatment and would provide no basis for determining liability without making an individualized fact-intensive inquiry into the details of each employee's daily activities. When there is no policy or plan in violation of the FLSA common to all putative class members, collective treatment "would not serve the interests of judicial economy," and "plaintiffs should not be permitted to request court-supervised notice as a tool for drumming-up business." Robinson, 2006 WL 3360944, at *6.

## IV.    CONCLUSION

The Court should deny Plaintiffs' Second Motion for the same reasons it denied their first motion for conditional certification.  In view of Plaintiffs' now repeated failure to meet their burden in seeking collective treatment of the putative class, Hewitt requests that this time the Court deny Plaintiffs' motion *with prejudice*.  This lawsuit is not appropriate for collective treatment, and Plaintiffs should not be allowed repeatedly to waste the time and resources of the Court and Hewitt on repetitive, futile requests for conditional certification.

In the event, however, that this Court were to conditionally certify a class, Hewitt requests that the Court (1) reject the inaccurate and overreaching notice and consent forms that Plaintiffs propose; (2) reject Plaintiffs' unwarranted attempt to intrude into the privacy of the putative class members by obtaining for themselves—rather than for a neutral third-party administrator—the names, addresses, and telephone numbers of the putative class members; and (3) permit the parties a reasonable period of time to negotiate and agree upon the content, format, and means of distribution of an appropriate notice and consent form.

Respectfully submitted,

HEWITT ASSOCIATES, LLC


By: s/ Richard L. Alfred
       Richard L. Alfred
       Counsel for Defendant
       SEYFARTH SHAW LLP
       World Trade Center East
       Two Seaport Lane, Suite 300
       Boston, Massachusetts 02210
       Tel: (617) 946-4802
       Fax: (617) 946-4801
       ralfred@seyfarth.com

       Louisa J. Johnson
       Counsel for Defendant
       SEYFARTH SHAW LLP
       1545 Peachtree Street, N.E., Suite 700
       Atlanta, Georgia 30309
       Tel: (404) 888-1023
       Fax: (404) 724-1523
       lojohnson@seyfarth.com

       Ashley Rosenthal
       Florida Bar No. 0513792
       arosenthal@therosenthallaw.com
       Jason Rosenthal
       Florida Bar No. 0009482
       jrosenthal@therosenthallaw.com
       Counsel for Defendant
       THE ROSENTHAL LAW FIRM, P.A.
       4798 New Broad Street N.E., Suite 310
       Orlando, Florida 32814
       Tel: (407) 488-1220
       Fax: (407) 488-1228

March 9, 2010

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **Defendant's**

**Opposition to Plaintiffs' Second Motion To Create a Conditional Opt-In Class** has been

filed using the CM/ECF system, which will automatically send electronic notification of such

filing to the following counsel of record:

Wolfgang M. Florin
Gregory A. Owens
Christopher D. Gray
FLORIN ROEBIG, P.A.
777 Alderman Road
Palm Harbor, FL 34683

This 9th day of March, 2010.

    s/ Louisa J. Johnson
Louisa J. Johnson
Counsel for Defendant
SEYFARTH SHAW LLP
One Peachtree Pointe
1545 Peachtree Street, Suite 700
Atlanta, GA 30309-2401
Telephone:  (404) 888-1023
Facsimile:  (404) 724-1523
lojohnson@seyfarth.com